# Pennsylvania Railroad Co.'s Appeal. Junction Railroad Case.

80    265
f218    ²648

1. The Junction Railroad Company was incorporated to construct a road from a point on the Philadelphia and Reading Railroad to a. point on the Philadelphia, Wilmington and Baltimore Railroad. The line traversed ground of these roads and of the Pennsylvania Railroad, that of the last company being the central part of the line and used as their " yard." The road was promoted by the three companies ; they owned the stock, their presidents were officers in the Junction company, which constructed all the line except the portion through the " yard," this was constructed by the Pennsylvania company, under the direction of Thomson, their president, who was also president of the Junction company. No measures had been taken to condemn the land through the " yard," for the Junction company. They by bill asked for a decree that they were entitled to the " exclusive ownership, possession and use " of that portion through the "yard." *Held*, that they were not entitled to such decree.

2. The "yard" belonging to the Pennsylvania company, no right to it could be conveyed directly by Thomson as their president and executive officer; and no acts or declarations of his as such officer, could pass their rights or franchises by way of estoppel. ·

January 5th 1876. Before AGNEW, C. J., SHARSWOOD, MERCUR, GORDON, PAXSON and WOODWARD, JJ.

Appeal from the decree at Nisi Prius : Of January Term 1868, In Equity.

On the 7th of January 1868, the Junction Railroad Company filed a bill against the Pennsylvania Railroad Company and J. Edgar Thomson, president of said company.

On the 3d of May 1860 (Pamph. L. 780), an Act of Assembly was passed incorporating J. Edgar Thomson, George C. Franciscus, S. M. Felton, Asa Whitney, J. Dutton Steele, Marshall B. Hickman, H. Jones Brooke and Morris S. Wickersham and those who might be associated with them by the name of the Junction Railroad Company subject to the General Railroad Law of February 19th 1849. The company was authorized to construct a railroad from "a point upon the Philadelphia and Reading Railroad, at or near the bridge of said company near Peters' Island, in the river Schuylkill; thence by the best route to a point upon the line of the Pennsylvania Railroad, within one mile east of George's Run, at the village of Hestonville; thence by the line of the Pennsylvania Railroad, by the most direct and practicable route, to a point upon the line of the Philadelphia, Wilmington and Baltimore Railroad."

The act provided that the company be managed by five directors, of whom one should be president; the capital to consist of 5000 shares of $50 each; the company was authorized to borrow $300,000 and issue bonds for that amount bearing interest at 7 per cent. per annum, and secure the loan by mortgage on "all the corporate rights, franchises, property real and personal of whatsoever kind belonging to said company."

A supplement passed March 23d 1861 (Pamph. L. 177), authorized the Junction Railroad Company "to connect their road with the road of the Pennsylvania Railroad Company, at or near the West Philadelphia Waterworks in the city of Philadelphia, to use the roadway of the Pennsylvania Railroad and of the West Chester and Philadelphia Railroad, or either of them, with the consent of such companies respectively, and construct a road to connect them or either of them with the Philadelphia, Wilmington and Baltimore Railroad, at or near Gray's Ferry, or may construct the whole or such parts of their railroad as may be needful, with or without the use of one or both of the roads of the companies aforesaid, to make a complete line of railway from a point on the Philadelphia and Reading Railroad, at or near the bridge at Peters' Island, to a point on the Philadelphia, Wilmington and Baltimore

Railroad, at or near Gray's Ferry Bridge, by the most convenient and practicable route."

The company were afterwards authorized to borrow money to the amount of $500,000.

The plaintiffs organized and proceeded to carry out the objects of the acts of incorporation and its supplement. They constructed a railroad from a point on the Philadelphia and Reading Railroad to Haverford street, and also from the north side of Market street to a point on the Philadelphia, Wilmington and Baltimore Railroad at or near Gray's Ferry. Between the north side of Market street and Haverford street the ground belonged to the Pennsylvania Railroad Company, being what is called that company's "yard;" the road on this portion of the line was actually made by the Pennsylvania Railroad Company, they paying the cost of materials, labor and all costs of construction.

The question in the case was whether this portion of the road was built for the plaintiffs or whether it remained the property of the Pennsylvania Railroad Company.

The bill set out :—

1, 2, 3. The Acts of Assembly of 1860 and 1861, under which the plaintiffs were incorporated, &c.

4. The stock of the Junction Railroad Company, except a few shares issued to individuals, was subscribed for and was held by the Pennsylvania Railroad Company, the Philadelphia, Wilmington and Baltimore Railroad Company, and the Philadelphia and Reading Railroad Company, in equal, or nearly equal proportions.

5. The presidents of the three railroad companies had always been members of the board of directors of the Junction Railroad Company since their organization ; J. Edgar Thomson, president of the Pennsylvania Railroad Company, was elected president of the Junction Railroad Company on the 3d day of October 1861, and retained the office until the 27th day of April 1867, when Isaac Hinckley, president of the Philadelphia, Wilmington and Baltimore Railroad Company, was elected in his stead.

6. After the passage of the Act of 1861, complainants determined to construct a distinct and independent railroad between a point on the Philadelphia and Reading Railroad, at or near the bridge at Peters' Island, and a point on the Philadelphia, Wilmington and Baltimore Railroad, at or near Gray's Ferry Bridge, and proceeded to have the necessary surveys, plans and profiles made to indicate the route of their road between these termini ; this route was actually located on the ground before the month of April 1862.

7. The location originally selected for that portion of the railroad, extending from the terminal point on the Philadelphia and Reading Railroad, near the bridge at Peters' Island, to Haverford street, was afterwards modified by the direction of the board of surveyors of the city of Philadelphia, from the point where the latter line diverges from a point on Thirty-eighth street, to the

common terminus at Haverford street; the location, as altered, was approved by the board of surveyors, on the 21st day of April 1862, and the alteration was adopted by the directors of the Junction Railroad Company, on the 3d day of May 1862.

8. The location originally selected for the portion of the railroad, from Haverford street to the point near Gray's Ferry, adopted for the connection of the said railroad with the Philadelphia, Wilmington and Baltimore Railroad, was submitted to the board of surveyors and approved by them on the 21st day of April 1862; afterwards some slight alterations were made in the alignment of the said location, south of Spruce street, with the approval of the board of surveyors; the entire line from Haverford street, as thus altered, was approved by the said board of surveyors, on the 8th of December 1862, and adopted by the directors of the Junction Railroad Company, on the 10th of the same month.

The whole route as above stated was indicated in a plan attached to the bill.

9. The plan was a reduced copy of the two official plans on file in the office of the said board of surveyors, showing the entire route of the complainants' railroad, from its connection with the Philadelphia and Reading Railroad, near the bridge at Peters' Island, to its connection with the Philadelphia, Wilmington and Baltimore Railroad, near Gray's Ferry Bridge; and the right to use the location for a railroad, became vested in the Junction Railroad Company, exclusively, on the adoption and approval of the said location.

10. The order of the directors to place the road according to that route under contract.

11. The work proceeded under the direction of the president and chief engineer of complainants, who were president and chief engineer of the Pennsylvania Railroad Company.

12. In November 1863, the progress of the work, north and west of Haverford street, had been such as to permit a connection to be made at a point east of Thirty-fifth street, between the Pennsylvania Railroad and a single track of the Junction Railroad extending to that point from the Philadelphia and Reading Railroad; this connection was temporarily made to provide, as soon as possible, a continuous route from the Philadelphia and Trenton Railroad, via the Philadelphia and Reading Railroad, the track of the Junction Railroad Company, the Pennsylvania Railroad, the Philadelphia and West Chester Railroad, the Delaware Extension of the Pennsylvania Railroad crossing the Schuylkill at the Arsenal bridge, to the Philadelphia, Wilmington and Baltimore Railroad, on Washington street, on the eastern side of the Schuylkill; and it was intended to be dispensed with on the completion of the Junction Railroad.

13. In December 1864, a track of the Junction Railroad from

Gray's Ferry to the Philadelphia and West Chester Railroad was completed and connected with the latter road, enabling trains to pass entirely on the west side of the Schuylkill river, from the Philadelphia and Reading Railroad to the Philadelphia, Wilmington and Baltimore Railroad, at Gray's Ferry, without using any part of the Delaware Extension of the Pennsylvania Railroad.

14. In August 1866, the track of the Junction Railroad, south of Haverford street, was completed, thus making a continuous railroad from Peters' Island to Gray's Ferry, excepting only the distance between the point of connection with the Pennsylvania Railroad, east of Thirty-fifth and Haverford streets; soon afterwards the road was somewhat altered, so that the Philadelphia and West Chester Railroad might be crossed in a manner less objectionable; and since then no part of the railroad of any other company has been used from one terminus of the Junction Railroad to the other, excepting only the tracks of the Pennsylvania Railroad, between the points aforesaid.

15. Complainants fully understood and believed that the delay in extending the Junction Railroad track from Haverford street to the point east of Thirty-fifth street, above named, was owing to the intention of the Pennsylvania Railroad Company to alter the location of their main tracks, so that the Junction Railroad might occupy, in whole or in part, the position now occupied by the track of the Pennsylvania Railroad next to the river.

16. Some time after the line of the Junction Railroad, except as aforesaid, had been completed, complainants learned that the Pennsylvania Railroad Company claimed that the section of the said railroad extending from Haverford street to Market street, had been constructed by the Pennsylvania Railroad Company, and for their own use; that it belonged exclusively to them, and that the Junction Railroad Company had no interest in it; that it was partly the Pennsylvania Railroad proper and partly the Delaware Extension of that railroad—the latter being the name given to the railroad constructed on the location of the Junction Railroad from Haverford street to Market street. This claim led to a protracted negotiation in which complainants failed to induce the Pennsylvania Railroad Company to recognise any right of the Junction Railroad Company in the said road; the Pennsylvania Railroad Company refused, and still did refuse, to permit the Junction Railroad Company to run locomotives on or over the said section of road, or to complete the construction of the Junction Railroad between its present connection with the Pennsylvania Railroad east of Thirty-fifth street and Haverford street. The Junction Railroad Company had spent over $870,000 in the construction of their road; the road was constructed in the most substantial manner, with every appliance of a first-class railroad; it was intended for the interchange of passengers and freight between

the great railroads converging towards the city of Philadelphia, on the west side of the Schuylkill river, and to relieve the streets of the city on the east side of the river from the passage of cars between the said railroads; the capital and credit of the Philadelphia and Reading Railroad Company, the Philadelphia, Wilmington and Baltimore Railroad Company, and the Pennsylvania Railroad Company were jointly contributed towards the construction of the road, with the expectation that each of them should have an equal share in its management and control; the attempt of the Pennsylvania Railroad Company to appropriate the middle section of the said road, would prevent the Junction Railroad Company from carrying on the business of a transporting company at all, to a great extent defeat the objects for which the said railroad was constructed, and give to one corporation the absolute control of the interchange and delivery of the freight, mails and passengers brought to the Junction Railroad by the several roads with which it is connected. The most expensive work on the line of the Junction Railroad is a tunnel under Market and Chestnut streets; the approach to this tunnel through a deep cut, is completely occupied by the tracks of the railroad passing into and through it; and if the Junction Railroad Company are compelled to relinquish the section of their railroad north of the tunnel, they cannot possibly select a new location on which they can build a railroad leading into the tunnel.

17. Complainants have issued and sold bonds of the Junction Railroad Company to the amount of $800,000, secured by mortgages of the entire railroad property and franchises of the company; many persons were induced to purchase these bonds by representations that the railroad mortgaged was located and built as a continuous and complete railroad from the Philadelphia and Reading Railroad, at the bridge near Peters' Island, to the Philadelphia, Wilmington and Baltimore Railroad, at Gray's Ferry, and complainants have been formally required by the holders of many of these bonds to protect their rights.

The prayers were for a decree :—

1. That the complainants were entitled to the exclusive ownership and use of the railroad, especially the part north of the tunnel at Market street, &c.

2. That they were entitled to construct their road on the location shown by the plan from its connection with the Pennsylvania Railroad near Thirty-fifth street to Haverford street.

3. That the Pennsylvania Railroad Company, their officers, &c., be restrained from interfering with the rights of the complainants, &c., and from hindering them, their officers, &c., from completing the railroad or in using the road now or hereafter constructed for the passage of engines, cars, &c.

4. For futher relief.

The defendants answered :—

1-5. Admitting the allegations of these paragraphs.

6, 7, 8. After the passage of the original act of incorporation, a survey was made of the route described in said act, by J. Dutton Steele, at that time chief engineer of the Philadelphia and Reading Railroad Company; who, on the 9th of July 1860, made report to the complainants recommending, as an economic yet effective measure, the connection of the three roads, by using the intervening portions of the Pennsylvania Railroad and the West Chester and Philadelphia Railroad, and that further legislation to effect that purpose should be obtained; the supplementary Act of March 23d 1861, was obtained, in accordance with the suggestions of this report, whereby the charter of complainants was modified, and the construction of their road, so as to connect its detached portions by the use of intervening lines, was authorized. Thus in fact was the road actually constructed, and its connections made; they admitted that complainants did cause surveys to be made, and locations to be plotted on paper, for an entire and connected line of independent road, extending from the line of the Reading Railroad Company at Belmont, to that of the Philadelphia, Wilmington and Baltimore Railroad Company, at Gray's Ferry; and that they did submit such surveys to the board of surveyors of Philadelphia, who, after certain modifications, approved the same; and that these surveys were acted upon and approved by the directors of the complainants.

9. They denied that either by said surveys, or by the plans prepared therefrom, or by their filing in the office of the board of surveyors, and being approved by said board, or by any action of the directors of the complainants or in any other way, had complainants acquired any right to use that part of said location which was upon and through the grounds of the Pennsylvania Railroad Company. The grounds of said company, through which said alleged location extended, constituted part of the depot grounds of the company at the West Philadelphia terminus of the road, and were duly acquired by authority of law· for such uses, and are necessary and requisite for the due enjoyment and execution of the franchises of the corporation, and could not be taken from it or placed under the control of another corporation, without great and serious injury to defendants' rights and interests, nor without defendants' consent; no such consent had ever been given, nor had any compensation ever been made or offered for the taking of such location through defendants' grounds, even if a right to the same could thus be acquired against their will, which they expressly denied to be the case.

10, 11. They admitted the allegations in these paragraphs.

12. They admitted the averments in this paragraph as to the making the railroads connecting, &c., but denied that the use of the tracks from the connection at Haverford street, through the

depot grounds of the Pennsylvania Railroad Company, to the north side of Market street, was intended to be temporary, and to be dispensed with, by the continuance of an independent line of the Junction Railroad Company through the said grounds, if thereby it was meant that the Pennsylvania Railroad Company or its officers were so informed, or had so agreed, or that, as against said company, any such right had in any way been acquired. They averred that from the time of such connection, said tracks had 'been used by complainants from that point to the north side of Market street, they paying therefor a stated compensation, according to an established rate, in accordance with which monthly settlements and payments had been regularly made; and the business had been thus transacted, safely and conveniently for both parties, without hindrance, delay or embarrassment, and in a manner that was just and equitable to all.

13, 14. They admitted the allegations in these paragraphs; the entire length of the road being 24,400 feet, or about $4\frac{62}{100}$ miles, consisting of 10,200 feet of track of Junction Railroad, extending from its connection with the Philadelphia and Reading Railroad at Belmont, to its connection with the line of the Pennsylvania Railroad near Haverford street; or 5150 feet of tracks belonging to the Pennsylvania Railroad Company, extending from that point to the north side of Market street; and of 9050 feet of Junction Railroad track, from that point to the connection at Gray's Ferry with the line of the Philadelphia, Wilmington and Baltimore Railroad Company.

15. The defendants had no information of the understanding stated in this paragraph, but if it existed, it was not authorized by or founded upon any action of the Pennsylvania Railroad Company.

16. They claimed that the line of railroad which connected the north side of Market street with Haverford street, was their property; it passed through their grounds, and was built with their money; but they had at all times cheerfully afforded complainants safe, speedy and convenient transit over it, receiving a reasonable compensation. This portion of the road extended through their depot grounds, the possession and control of which was imperatively required for the proper and safe enjoyment and execution of their franchises, and could not be taken from them without endangering the security of the persons and property carried by them. This possession and control of defendants was perfectly consistent with the safe and convenient transaction of all their business by complainants, and had been found to be so by actual experience. It was precisely such as was recognised in, and was contemplated by, the supplement of March 23d 1861, which, while it authorized the construction of an entire and connected line, permitted, and contemplated, the use of portions of intervening lines.

The Pennsylvania Railroad Company insisted that all the grounds connected with, appertenant to, and useful for their depot arrangements were covered by the franchises of their company, and were in truth a part of their location; and did in this instance, in fact and in law, constitute a prior location on their part, since the same were selected, acquired, and located by them, for their railroad uses, many years prior to the pretended location of complainants.

17. They denied the averment of this paragraph.

A replication was filed, and R. A. Willson, Esq., was appointed examiner.

The evidence shows as follows:—

At a meeting of the incorporators, held August 1st 1861, they accepted the Act of March 23d 1861, and also the Act of April 23d 1861, authorizing railroad companies whose roads are connecting to hold the stock or bonds of each other. At the same time, stock in the Junction Railroad Company was subscribed for. J. Edgar Thomson, who was president of the Pennsylvania Railroad Company, S. M. Felton, who was president of the Philadelphia, Wilmington and Baltimore Railroad Company, and Asa Whitney, each subscribed for 170 shares; Charles E. Smith, who was president of the Philadelphia and Reading Railroad Company, and J. Dutton Steel subscribed for three shares each. The five persons above named were chosen directors, and they afterwards elected Mr. Thomson president of the company, and Joseph Lesley, secretary. At the same meeting, the president was authorized to issue bonds to the amount of $300,000, to be secured by a mortgage on the railroad, and to be guarantied by the three companies. Subsequently a line of road was submitted by the engineer, J. A. Wilson; this line commenced on a line previously located at a point some distance from the north end, crossed Haverford street, and crossing the tracks of the Pennsylvania Railroad, 300 feet west of the head of the West Philadelphia "yard," passed to the south side of that road, &c., the tangent, south of Haverford street, being so located as to run clear of the (present) tracks of the Pennsylvania Railroad. On the 28th of December 1861, that portion of this line, from about Haverford street to Peters' Island (on the Philadelphia and Reading Railroad) was adopted, and on the 4th of April 1862, contracts for grading the road north from Haverford street were awarded.

Mr. Wilson in his testimony said that the Junction Railroad as built under his direction commenced on the Philadelphia and Reading Railroad near the Columbia bridge, ran south and connected with the Pennsylvania Railroad near Fairmount, being near Thirty-fourth street; it then extended from the north side of Market street southward to the Philadelphia, Wilmington and Baltimore

30 P. F. SMITH—18

[Pennsylvania Railroad Co.'s Appeal.]

Railroad near Gray's Ferry, and was intended to connect with the Pennsylvania Railroad at the north side of Market street.

At the annual meeting of the stockholders of the Pennsylvania Railroad Company, held February 3d 1862, the directors reported that the three companies had organized the Junction Railroad Company, the object of which was to connect these railways by a continuous line from the Reading Railroad near Peters' Island to the Philadelphia, Wilmington and Baltimore Railroad at Gray's Ferry, intersecting the Pennsylvania Railroad near the Wire bridge, near Fairmount, so that an interchange of freights might be effected.

At a meeting of the board of surveyors of Philadelphia, held April 1st 1862, the plan of the Junction Railroad from Haverford street to Gray's Ferry, and the plan of the Junction Railroad from Columbia bridge to Haverford street were approved. On the 8th of December 1862, the board of surveyors approved a revised plan of a line of the Junction Railroad from Haverford street to Gray's Ferry.

Mr. Thomson, the president, and Mr. Smith, treasurer of the Junction road, in their report in 1863 to the auditor-general, stated the line of the road to be continuously from Belmont (the extreme north end) to Gray's Ferry (the extreme south end), and that its length was $4\frac{62}{100}$ miles. Similar statements were made in the reports of 1864, 1865 and 1866. In a subsequent year, probably the next, a similar report was made out under direction of Mr. Smith; it was signed and sworn to by him and sent to Mr. Thomson; he returned it, signed by himself, to Mr. Smith with alterations, viz., reducing the length of the line to $3\frac{676}{1000}$ miles; the length of track from $7\frac{74}{100}$ miles to $6\frac{881}{1000}$ miles, and some other alterations, reducing lengths, &c. Mr. Smith erased his name and it never was sent to the auditor-general.

Mr. Smith testified that the board of directors of the Junction road did not appear to meet frequently because the stock belonged to the three companies in equal proportions and each was represented by its own president, that they had entire confidence in each other, and met frequently but informally without having a record of their meetings on their minute book; the charge of constructing the road was committed to the engineers under the control of the president. Witness saw the road from time to time as it progressed. On one occasion Mr. Thomson said the Pennsylvania company and Junction company should exchange tracks at the intersection of their roads about Lipp's brewery near Thirty-fifth street; the road was then being constructed from Belmont, but had not been finished; work was then being done on the tracks south from Haverford street; witness had never been informed by Mr. Thomson or any officer of the Pennsylvania company that it was being done for that company; witness had no idea that it was

so ; this conversation was near the place of the intersection.    In August 1866 witness saw across a cut on the road near Lipp's brewery, a ridge of dirt about four feet high ; he then recognised that some one claimed adverse possession ; at an interview some six weeks afterwards with Mr. Roberts, assistant president of the Pennsylvania company, Mr. Wilson, the engineer of the Junction Railroad, and Mr. Hinkle, Mr. Roberts claimed for the Pennsylvania company the mile of road in controversy; this was the first knowledge witness had of the claim ; Mr. Thomson was then in Europe ; the matter was left in abeyance till his return.    The Junction Railroad tracks between Haverford street and Market. tunnel were located westward of the tracks of the Pennsylvania Railroad, and did not take any of the ground then occupied by the Pennsylvania Railroad improvements.    At the northern end, the Junction road occupied grounds of the Philadelphia and Reading Railroad and at the southern end ground of the Philadelphia, Wilmington and Baltimore Railroad ; it had been informally agreed that the ground taken from each company should be valued and paid for by stocks or bonds of the Junction company ; this arrangement was never consummated.    Before this interview witness had not known that the Pennsylvania company were collecting tolls on the part in dispute.

Mr. Felton testified that the location that was adopted by the Junction company was for a continuous road from Belmont to Gray's Ferry ; he saw the work on the road in progress from time to time ; the understanding of witness was that the road was to be continuous from Belmont to Gray's Ferry ; but the then present two ends were to be built to connect with the Pennsylvania Railroad at one end north of the tunnel and at the other near Fairmount ; the construction of the remaining portion was to be decided thereafter ; he had never any idea that the Pennsylvania company would claim the ownership of the portion of the road in dispute until this controversy began ; he understood the location adopted was a fixed one.

On the 25th of January 1862, Mr. Thomson wrote to St. G. Tucker Campbell, Esq., requesting him to draw a mortgage for the Junction company on their road from Peters' Island bridge to Gray's Ferry to secure an issue of $350,000 in bonds, &c.

Mr. Thomson testified that whilst he was president of the Junction company, from 1861 to 1867, their railroad was built ; it extended from the Reading Railroad at Belmont to its intersection with the Pennsylvania Railroad near Haverford street, and commenced again at the south boundary of the property of the Pennsylvania company at Market street, and extended thence to the Philadelphia, Wilmington and Baltimore Railroad near Gray's Ferry, using the Pennsylvania Railroad as the intermediate link ; a portion of the track used for the Junction road belonged to the

Delaware Extension of the Pennsylvania Railroad; the Junction company never obtained from the Pennsylvania company a right of way between Haverford street and Market street; the Junction company never contributed money, work or material to the construction of the road between those points; it was built there wholly by the Pennsylvania company; Mr. Smith, Mr. Felton, and other officers of the Junction company were informed of this fact by witness in May 1862; witness had previously given instructions to the chief engineers of the two companies as to the construction of the road between these points.

On the 12th of May 1862, he wrote to John A. Wilson, chief engineer of the Junction company, that, "under the new location of the Junction Railroad, that portion of it between Market and Haverford streets on the old location, will, in consequence of so material a portion of the Pennsylvania Railroad being used above Haverford street, be constructed by the Pennsylvania Railroad Company; this is also advisable in consequence of its passing entirely through the grounds of the Pennsylvania Railroad Company. * * * In your accounts you will keep the expenditure upon the Junction road in two divisions separately; the first division between the Philadelphia and Reading Railroad and the Pennsylvania Railroad and the second between the north side of Market street and the Philadelphia, Wilmington and Baltimore Railroad near Gray's Ferry."

He wrote to Mr. Smith May 13th 1862, viz. :—

" Dear Sir: Since the visit of yourself and Mr. Felton, I have considered the subject referred to. The letter to Mr. Wilson was dictated by what I conceive to be the true interest of the Junction Railroad Company, under the circumstances.

" That portion of the Pennsylvania Railroad used by the Junction Railroad Company to be paid for in its business at the same rate per mile as charged upon the other portions of the line.

" If it should, hereafter, be thought advisable to make the Junction Railroad a continuous line, we would not object, and would dispose of such portions of the line as it would be necessary to use, at cost. At present, I think the directions given are best for all parties. With a view to the probable purchase and construction of this part of the line by the Junction Railroad Company, at a future period, it would be best that the mortgage remain unchanged, and that the requisite bonds be reserved for that object."

This letter was produced on request of the defendants' counsel from the letter files of the Philadelphia and Reading Railroad Company.

Witness said there was no suppression from the other officers of the Junction company; that portion of road was being built by the Pennsylvania company, at their own expense, and it was his understanding that they knew the construction was so being done; all the means derived from the stock and bonds of the Junc-

tion company were expended in the construction of the other portions of the road. No official notice had ever been given by the Junction company to the Pennsylvania company, of a location of the Junction road through their grounds.

Mr. Wilson testified, that he acted in accordance with the instructions in Mr. Thomson's letters of May 1862, and whilst the work was progressing, Messrs. Felton and Smith were both along the road inspecting it; neither of them made any complaint or remonstrance about the absence of a distinct line of the Junction road between Haverford and Market streets; a piece of road was built by witness from Market street to a point near the Pennsylvania company's round-house to connect the tracks of the Junction road at Market street with the Pennsylvania company's tracks at the round-house; the grading was commenced in the summer of 1862; the work was done at the expense of the Pennsylvania company; the track was not laid at the 1st of March 1864. The original location of the Junction road extended from the Reading Railroad to the Pennsylvania road at Haverford street and was a much lower grade than the (then) present tracks of the Junction Railroad at Lipp's brewery; when the re-location of that portion of the Junction Railroad was made necessary by the action of the board of surveyors, the grade of the Junction road was so arranged as to allow a connection with the tracks of the Pennsylvania road at Lipp's brewery, and the original location was abandoned. The object of a through connection being thus secured, no further steps were taken relative to a location for the Junction road south of that point except to dot on the plans what could be done if desirable thereafter; engineers do not understand the running of a line on paper as constituting the location of a road. Previously to Mr. Thomson's letter of May 12th 1862, no work had been done on the line from Belmont to Gray's Ferry; witness considered the acceptance of the revised location of the board of surveyors an abandonment, but knew of no corporate action of the directors of the Junction road on the subject. Witness had no knowledge of anything said or done by any one connected with the Pennsylvania company calculated to mislead any one connected with the Junction Railroad Company. The lettings to contractors by the Junction company were confined to the portions of the road between Belmont and Lipp's, and between Market street and Gray's Ferry.

Mr. Felton testified, that he had no doubt the interview between Mr. Thomson and himself, and Mr. Smith, spoken of by Mr. Thomson, took place; but that he should not consider that Mr. Thomson's letter to Mr. Smith could be regarded as an intention of the Pennsylvania Railroad Company to claim the ownership of the portion of the road in dispute, if the Junction company should think it advisable to buy it.

There was a large amount of testimony of a similar character to that in the foregoing synopsis.

There was evidence also that the portion of road in controversy passed through the "yard" of the Pennsylvania Railroad Company, in which there were a large number of tracks; that at the time the testimony was taken (1869) there were two hundred trains passing in and out of the yard every twenty-four hours, besides engines at work in the yard, which crossed Bridge street at least fifty times in twenty-four hours; that it would be very dangerous as well as very inconvenient to the company owning the "yard" to have engines of another company, of which they had not the control, to pass through the "yard." There was also evidence showing that it would seriously impede the business of the Junction Railroad Company to have a portion of a line of railroad over which they had to move so large an amount of business as they had, to be interposed between two ends of their road, and be out of their control; particularly on a road so short as the Junction Railroad; that it would be "an act of insanity" for one railroad to be extended into a tunnel when the egress from it was obstructed by the tracks of another company. There was evidence of acts of Mr. Thomson for the purpose of showing such a recognition of the rights of the Junction Railroad Company to the road in dispute as estopped the Pennsylvania Railroad Company, he being their president, from claiming the exclusive ownership of that portion; and of acts of the officers and directors of the Junction Railroad Company recognising that ownership.

On the coming in of the report of the examiner, he and Samuel Robb, Esq., were appointed masters, to report the facts of the case and such decree as they might think fit. They made a very elaborate and lengthened report. The following are extracts:—

"The main contention in this action is two-fold—first, as to whether the company plaintiff contemplated and endeavored to carry out the construction of a continuous line of railroad by the route described in the bill, from the Philadelphia and Reading Railroad near Belmont to the Philadelphia, Wilmington and Baltimore Railroad near Gray's Ferry, to be owned and controlled by them as an independent line, and as distinguished from a line made up of two strips of railroad, separated, and only connected by an intervening portion of railroad, owned and controlled by the Pennsylvania Railroad Company; and second, as to whether, if such were the intention and effort of the company plaintiff, they actually effected their purpose, in so far as to be entitled to be the owners of the portion of railroad which extends from the north side of Market street to Haverford street, with the right to construct a line of road to connect that portion of the said road just referred to at Haverford street, with their own road, at its intersection with the Pennsylvania Railroad at a point east of Thirty-fifth street."

After reporting some preliminary and undisputed facts, they say :—

"The result of the experiments and deliberations was the obtaining of the supplementary Act of Assembly, which, unquestionably and admittedly, authorized the construction either of a continuous or broken line of road.   So far, then, as any inference can be drawn from the conduct of the incorporators, as shown in the minutes of their meetings, and the resulting legislation (which afford all the light that the masters have on the subject), it would seem that, down to the election of the directors, the question whether a continuous road or connecting strips should be built, had not only not been determined, but was necessarily and purposely left open, *the right*, however, *being secured to adopt either mode.* * * *

" On the 4th of April 1862, a special meeting of the board of directors of the Junction Railroad Company was held, at which Mr. Thomson, *inter alios*, was present, and then, as appears from the minutes, the plans of the Junction Railroad, with accompanying profiles, were presented, and contracts for the work, on the line from Belmont to Haverford street, awarded.   These plans, as shown by the testimony of John A. Wilson, and by certified copies of the sames plans, as approved by the board of surveyors on the 21st of April 1862, in a slightly modified form, exhibit a *continuous* route from Belmont to Gray's Ferry, which, according to Mr. Wilson's testimony, was divided into sections, numbered from one to five, inclusive ; that from Haverford street to the north side of Market street, being section No. 3.   The acceptance of the plans in this form would seem to indicate, especially in the absence of strong evidence to the contrary, that the board of directors intended to construct the road according to the plans submitted; and this view is fortified by the resolution passed the same day, instructing the engineer to place the whole line of the road under contract as soon as expedient.

" If they had in view only parts of the line, as delineated on the plans, it is strange that they should not have expressed themselves accordingly ; and it would be stranger still if they supposed that the Pennsylvania Railroad Company was to build, own, and control that part of the line from Haverford street to Market street, that the directors of the Junction Railroad Company should have assumed not only to approve such part of the route, but also to instruct their engineer to put it under contract. * * * A special meeting of the same board was also held on the 3d of May 1862, at which it was resolved ' that the line of the Junction Railroad be so amended as to conform to the line adopted April 21st 1862, by the board of surveys,' and this line so adopted was the *continuous* one from Belmont to Gray's Ferry. * * * The continuous line referred to, as appears from the testimony and reports of the engineer, having been actually surveyed upon the ground, as well

as drawn upon the paper plans, and having been thus approved by the board of directors, would seem to be the one described in the directions for the mortgage as ' located.'   At a special meeting of the same board, held December 10th 1862, at which Mr. Thomas A. Scott was present, acting for Mr. Thomson, it was resolved on motion of Mr. Scott, ' that the improved location (as exhibited on plan of engineer, and approved by the board of surveys of Philadelphia, December 8th 1862), for that portion of the Junction Railroad between Haverford street and  Gray's Ferry, be approved of and adopted by this board.' * * * The directors, in approving and adopting it, approved and adopted the very location, or line, which is in controversy, and claimed to be owned by the Pennsylvania Railroad Company. * * *

   " There would seem to be no doubt, from the foregoing historical review, that those intrusted with the direction of the affairs of the Junction Railroad Company, intended and attempted to construct a continuous line of railroad, to be owned and controlled by that company, from Belmont to Gray's Ferry.

   " 2.  Did the Junction Railroad Company acquire the right to build their road over the disputed territory, which belonged previously to the Pennsylvania Railroad Company, and if so, was the road for such portion built by them, or by anybody else, in such a manner that they, the Junction Railroad Company, can lawfully claim to be the owners of it ?   This inquiry is confined entirely to that part of the line which extends from the north side of Market street to Haverford street. * * *

   " It is a consideration of extreme importance in the whole of this case, that the relations of the Pennsylvania Railroad Company to the organization and management of the Junction Railroad Company, and the construction of its road, were such, that the ordinary rules which regulate the rights of railroad corporations as regards the owners of real property needed for the exercise of their franchises, ought not to be rigidly applied to the case in hand, in any of the disputed aspects of it.   The first named company was one of the three corporations which projected the Junction Railroad ; it became an owner of nearly one-third of the stock of the new company, which was entirely owned by the said three companies, with the exception of a few shares, which were held by the presidents thereof, individually, for the purpose of legally becoming directors, although they, admittedly, represented in the board, not their private, but their representative interests ; the projected railroad was intended to be for the common benefit of the said three corporations in the matter of transportation, as well as of income ; in pursuance of the general plan, each of the said corporations allowed the use of a portion of the real estate owned or occupied by them, without any formal or completed understanding as to compensation being rendered therefor ; either Mr. Thomson,

the president both of the Pennsylvania and the Junction Railroad Companies, or Mr. Thomas A. Scott, as his substitute on behalf of the Pennsylvania Railroad Company (though not a member of the board) was present at the meetings of the directors of the Junction Railroad Company, when the whole location and route of the railroad to be built were under consideration, and either finally adopted, or made the basis of contracts as finally adopted; and the actual construction of the railroad as located, was done under the immediate supervision of the president and engineers of the Pennsylvania Railroad Company, in their same capacity as connected with the Junction Railroad Company.

" The three companies were not dealing with each other in this matter at arms' length, but in a generous confidence, growing out of their common interest in the projected enterprise, which permitted, and was actually followed by a certain want of formality and disregard of usual precautions. The masters think that no case very similar to this can be found. It is, as it were, a law to itself. Certainly, inasmuch as, under the circumstances referred to, the two other corporations were led into permitting the occupation and use of property acquired by them in the same manner as the Pennsylvania Railroad Company had acquired the ground in dispute, if it be true, as the masters think and have reported, that the directors of the Junction Railroad Company intended to construct a continuous line over that ground, and if, therefore, those other corporations invested their money, entered into their obligations as guarantors of the bonds of that company, and permitted such use of their grounds in view of such a mode of construction, as must be presumed, the case ought to be a very strong one which would justify the Pennsylvania Railroad Company, after the road was constructed, or at any time after the enterprise was started, and the obligations and privileges coming from the other companies were given, to claim that that part of the roadway which passed through the grounds of that company, had not been secured or dedicated, and that, therefore, it could not be used. On the contrary, in view of the peculiar character of the Junction Railroad Company, and of the circumstances attending its organization, and the manner in which its road was laid out and constructed, and, especially, in view of the knowledge which the Pennsylvania Railroad Company must be presumed to have had, and actually appear, from the reports previously referred to, to have had, of the progress of affairs, the masters are of the opinion that the company defendant ought to be bound by the action of the directors of the Junction Railroad Company in the locating of their road. * * *

" It must be conceded that this ground had been acquired by the company defendant prior to the location of the Junction Railroad, but that it could not, at that time, have been in actual use as part of the yard, or for any other purposes, of the Pennsylvania Railroad

Company, is plain from the fact, that that part of the roadway of the Junction Railroad was almost entirely made by excavation, the tracks of the Pennsylvania Railroad being very little, if any, interfered with. In fact, the route selected was ' so located as to run clear of the (then) present tracks of the Pennsylvania Railroad Company's yard.' That this ground, however, has been or is needed for any other uses than as a roadway, can hardly be claimed, as it has been and is still occupied as such; and it, probably, would not be contended that such use of it could, in any view of the case now be prevented. It may be conceded that the use of this part of the road by the Junction Railroad Company, and the crossing of the Pennsylvania Railroad at the north end of it would not be desirable, and that it would necessitate great care on the part of employees of both companies to avoid accidents; but the masters are not able to see that anything more than this is involved, and this has been much aggravated by the efforts made to accommodate an increase of business, which is largely owing to the existence of the Junction Railroad, since the time when the location was made, which is the time that ought to be considered in this connection. * * * The Acts of Assembly granted the right to the Junction Railroad Company to adopt the route in dispute; and they actually did so, unless it can be shown that there was something sacred from the touch of the legislature, and the exercise of the right of eminent domain in the ground necessary to be occupied, because it was owned by a railroad corporation, was convenient for its use, and would become more and more so as the business of that corporation increased. No such position could be maintained. * * * It only remains, on this point, to consider whether the right of way over the said ground has been paid for by the Junction Railroad Company, and, if not, whether that fact affects, in any way, the right to occupy and use it. As to the question of fact, it is admitted to be as claimed. It was proposed and understood that each company of the three projecting the road should be paid a fair compensation for the land taken from each; but, in the harmonious spirit and somewhat informal action which then prevailed, the matter was left unattended to, and the 'fair compensation' for any portion of such land was never estimated. * * * The compensation may be waived entirely, or, if not entirely, at least so far as security, or payment in advance, is concerned. It follows, then, that the company defendant cannot properly claim that the Junction Railroad Company has not acquired the disputed roadway because it has not paid what are commonly called the road damages. * * * The fact, however, that the matter of compensation was considered, and either neglected or waived, takes all force out of this argument, as urged on behalf of the Pennsylvania Railroad Company. If this right to such compensation still exists, that company has its appropriate remedy to recover it. The right to use

and occupy the ground, nevertheless, would not be postponed to its payment, if the principles of law applicable to such cases have been correctly stated. For this reason, and because of the part borne by the Pennsylvania Railroad Company in the projecting and organization of the Junction Railroad Company, and in the selection of a location for its road, as well as because the data for arriving at any conclusion as to the amount which might be due for the ground occupied, are not before the masters, they think that a decree should not be withheld until that amount can be determined.

"As to the claim that the Pennsylvania Railroad Company built and paid for the road in dispute, and that notice was given to the Junction Railroad Company in 1862 of their claim of ownership:

"It seems from the testimony of Mr. Thomson, Mr. John A. Wilson and Mr. William H. Wilson, that the Pennsylvania Railroad Company did furnish the material and the means by which the part of the road contended for was built and paid for. It may not be easy to comprehend why this should have been done in view of the facts, that it was the understanding, as well of that company as of the other companies interested, that that road was to form a part of the continuous line of the Junction Railroad, that the surveys and estimates were based on the same theory, and that $800,000 were finally raised by loan for the purposes of construction. * * * The actual oversight of the work of construction was intrusted to those who were at the same time connected with the Pennsylvania Railroad Company, and the instruction to use the material and money of that company came not from the Junction Railroad Company nor from Mr. Thomson as the president of that company, but from Mr. Thomson as president of the Pennsylvania Railroad Company.

"Taking into view, then, that the location selected for the Junction Railroad embraced this controverted portion; that proper steps were taken, in the peculiar circumstances of the case, to secure the right to occupy and use it; that this selection was known to the Pennsylvania Railroad Company; that they might be called partners in the enterprise; and, therefore, that they were estopped from acting for their own private advantage, and contrary to the expectations which their conduct and that of their representatives had raised, and against the interests of others who had embarked with them in this scheme on the faith of such expectations, it cannot be that, by simply using their own property to construct that part of the road, they can acquire the right to own and control the use of it.

"In view of such facts, they must be regarded as mere agents of the Junction Railroad Company. The road when built in this manner would be a part of the Junction Railroad, and not the Pennsylvania, and the only claim the Pennsylvania Railroad Company could have, growing out of such use of their own property, would

be for reimbursement of the amount thus expended. These conclusions are to be drawn and applied in this case, unless it can be made to appear that the Junction Railroad Company consented, either actually or constructively, to the Pennsylvania Railroad Company acquiring or having the ownership and control of this portion of the road, in consideration of their constructing it. It would not be sufficient to give the alleged rights to the latter company, that they informed the Junction Railroad Company that they were building this part of the road, or that they claimed to own it, for the latter company would have had the right either to assume that they would carry out the joint undertaking as agreed upon, or that, if not, their failure to do so would not avail their purposes. What are the facts as testified to in this branch of the case?

"In the first place, Mr. Smith, who was one of the directors and the treasurer of the Junction Railroad Company, as well as president of the Philadelphia and Reading Railroad Company, says, 'I was never informed, while the work was being done, by Mr. Thomson, or by any other officer of the Pennsylvania Railroad Company, that it was being done for the Pennsylvania Railroad Company. Such a thought never entered my mind.' Mr. Felton, another director of the Junction Railroad Company, and also the president of the Philadelphia, Wilmington and Baltimore Railroad Company, at the time of which he speaks, says, 'I never had any idea that they (the Pennsylvania Railroad Company) claimed that portion of the road, until this controversy begun.'

"It appears also from a communication from Mr. Thomson, as president of the Junction Railroad Company, to St. George T. Campbell, Esq., dated January 25th 1862, that instructions were given by the former as to the property to be covered by the mortgage, to which reference has been made before, and it shows that the Junction Railroad, as understood by him at that time, extended from the Philadelphia and Reading Railroad near Peters' Island bridge, over the Schuylkill, to the Philadelphia, Wilmington and Baltimore Railroad near Gray's Ferry, which could only be the continuous route.

"It seems, however, from the testimony of John A. Wilson, that after the date of that letter, Mr. Thomson changed his plan, and sent a message to Mr. Campbell, that he had decided 'that the portion of road between Market street and Lipp's brewery, should be built by the Pennsylvania Railroad Company.'

"Precisely in what capacity Mr. Thomson was acting when he gave those instructions, there is nothing to show. Certainly, as president of the Pennsylvania Railroad Company, he could not bind the Junction Railroad Company, nor could he, as the president of the latter company, make so material a change as the one referred to, without authority from the board of directors of the

Junction Railroad Company, at least, and no such authority from that company is claimed to exist. The first indication of Mr. Thomson's change of plan as to the line of the road, of which the date can be fixed, is found in the letter from him, as president of the Pennsylvania Railroad Company, to Mr. Wilson, under date of May 12th 1862. As the masters understand this communication, it evidently and necessarily implies that, down to its date, the intention had been that the part of the road in controversy should be not only a part of the line of the Junction Railroad, but that it should be constructed by the Junction Railroad Company. Else, why should he say that, 'under the new location' (which was not of this part of the road, but of that above Haverford street) 'of the Junction Railroad,' that 'portion of it between Market and Haverford streets, on the old location, will, in consequence of so material a portion of the Pennsylvania Railroad being used above Haverford street, be constructed by the Pennsylvania Railroad Company?' This means that, in Mr. Thomson's thought and purpose, there was to be a change in the constructing party, and that change could, in the nature of the case, only have been *from* the Junction Railroad Company. It is evident, however, from this letter alone, that Mr. Thomson even then considered that it was 'a portion of' the Junction Railroad which was to be built by the Pennsylvania Railroad Company. A reference, also, to the letter from Mr. Thomson to Mr. W. H. Wilson, written on the same day, will show that he, Mr. Thomson, at that time proposed only that the Pennsylvania Railroad Company should *build* that 'portion of' the Junction Railroad which ran through the grounds of that company, and thereby again showed that he then considered the road to be built to be separate and different from the Pennsylvania Railroad. The masters think that the only interpretation which can fairly and reasonably be put upon these communications, and upon the others connected with them, is that Mr. Thomson, for some reason not disclosed, but, apparently, for the sake of convenience, 'in consequence of its' (the Junction Railroad) 'passing entirely through the grounds of the Pennsylvania Railroad Company,' thought it better that the Pennsylvania Railroad Company should build, and therefore pay for, the part of the road in question, leaving the repayment of the amount thus expended for future settlement. This view—and only this view * * * reconciles the otherwise seeming inconsistencies of the oral testimony on this subject.

"If, however, the Pennsylvania Railroad Company did think that they would become the owners of that portion of the railroad between Market street and Haverford street by simply paying for its construction, they could have reached that conclusion only by overlooking well-established principles of law and equity. Such a result could not be reached in that way, not even if a formal notice had

been given to the board of directors of the Junction Railroad Company to that effect. The relation between the three companies making up the latter was, to a certain extent, fiduciary, and it could not be terminated by a mere notice. From its very nature it was continuing in its character. And whether this be so or not, it is plain that neither the letter to Mr. Smith nor the conversation between Messrs. Thomson, Smith and Felton, were such as would alter any of the rights of the parties then existing. Mr. Smith and Mr. Felton were but two of several directors, and neither, nor both of them, could, by their silence or consent, extinguish rights and interests of such a character and so intimately connected with the very purpose of their corporation. Moreover, these gentlemen seem, from Mr. Thomson's own testimony, to have repudiated promptly any suggestion that looked like the control of this part of the road by the Pennsylvania Railroad Company. It is plain, from their testimony, that they did not understand any such claim to be set up as that now pressed. In the most liberal application of legal principles, therefore, such a notice could not bind the Junction Railroad Company. Even if, however, it should be conceded that notice was given by the Pennsylvania Railroad Company to the Junction Railroad Company of their alleged claim just considered, in the terms of Mr. Thomson's letter to Mr. Smith and of his conversation with Messrs. Smith and Felton, and that such a claim had been recognised and acquiesced in by the Junction Railroad Company, it would still be true, from the very nature of the notice, that the latter company could insist, at any time, upon having the ownership and control of the part of the route in question transferred to them on the payment of the money actually expended in its construction.

" It follows, then, that the masters do not think the fact that the Pennsylvania Railroad Company built and paid for the road from Market street to Haverford street, under the circumstances of this case, tends to show that it belonged to them, and that they have a right to withhold the ownership, use and control of it from the Junction Railroad Company. They having paid for its construction, may have their remedy to recover the amount thus expended, * * * but the masters do not think the decree should await the determination of that amount. * * *

" It remains only to consider what right the company plaintiff have as to the location described on said plan for the road from the northern terminus, just referred to, to a point east of Thirty-fifth street (or Lipp's brewery, as the place is sometimes called in the testimony), where the Junction Railroad first touches the Pennsylvania Railroad.

" It is not, on the one hand, denied that this location was adopted by the board of surveyors, and approved by the board of directors of the Junction Railroad Company. Nor, on the other hand, is it

claimed that the railroad was ever actually built on the said location. Both parties agree that the Pennsylvania Railroad was used for that distance—at first, for the purpose of making a through connection, by another route, before the other parts of the line were finished in August or September 1866 and afterwards until the bill was filed. The contention relates to an alleged abandonment of the location. It may be said, generally, that there is no evidence of any express abandonment, or of any intention on the part of the Junction Railroad Company to abandon it. Mr. John A. Wilson gave as his reason for thinking the location had been given up, that the board of directors *accepted* the revised line of the board of surveyors, which delineated a route for the Junction Railroad, from Belmont to the crossing of the Pennsylvania Railroad, near Haverford street, as distinctly as the old location. * * * This change was made, not at the instance of the Junction Railroad Company, but by order of the board of surveyors. How the *acceptance* of the new location could be construed to be an *abandonment* of it, is not very clear. It would seem to be directly the reverse. * * * The location is satisfactorily accounted for by the question, which seems to have arisen in 1862, as to whether or not an exchange of tracks could be made with the Pennsylvania Railroad Company at that point by the fact that a rock-cutting was necessary for that portion of the road, which cutting was not finished until 1866, and also by the great anxiety which existed 'after the work on the Junction Railroad had been begun,' to secure a through line from Belmont to the Philadelphia, Wilmington and Baltimore Railroad, which was actually secured in November 1863, by means of the Juntion Railroad from Belmont to Lipp's brewery, and thence by other railroads then built to the Philadelphia, Wilmington and Baltimore Railroad.

"However this may be, it is sufficient to establish the claim of the company plaintiff in the premises, that the Pennsylvania Railroad Company was one of the corporations combined for the express purpose of constructing an independent continuous line between the termini of the Junction Railroad, and that, by their representative in the board of directors, they recognised that route over the ground in dispute. The report to their chief engineer, and the letter of Mr. Thomson to Mr. Wilson, show that this location was known to the Pennsylvania Railroad Company at the time it was made, and there is no evidence that they ever objected to or protested against it, until about the time when this controversy arose in 1866. They cannot now set up a hostile claim which would defeat the purpose of the joint enterprise.

It is true that that company now has six tracks over that territory, whereas they had only two when the location was made, but they must be presumed to have laid the additional tracks with

their eyes open to the right of the Junction Railroad Company to claim its right of way at any time.

" Unquestionably, this right could be secured under the Acts of Assembly referred to, but the masters do not think such a resort necessary. * * * The masters are of opinion that the company plaintiff are authorized to construct their road on the route indicated in the plan attached·to the bill between the two points just considered, and, at or near Haverford street, to connect the two parts of their railroad there separated by a crossing of the Pennsylvania Railroad, as also indicated in the said plan. * * *

" The masters, therefore, report that the company plaintiff are entitled to the decrees prayed for in the first, second, and, as a necessary consequence, in the third prayers of the bill, but that the decree to be based upon the first prayer should be so framed as to permit the company defendant to prosecute any claim which they may have against the company plaintiff for compensation for the ground formerly belonging to the company defendant, which is occupied by the part of the railroad to which the said prayer relates, as well as for any amount expended, or materials furnished by the company defendant in the construction of that part of the road."

The defendants filed exceptions to the report; they were dismissed and the report confirmed.   The court at Nisi Prius, SHARSWOOD, J., decreed:—

1. That the complainants are entitled to the exclusive ownership, possession and use of the railroad located and constructed as in the said bill mentioned, and especially of that part of the said road north of the tunnel at Market street in the city of Philadelphia, known as section three of the Junction Railroad; without prejudice, however, to the right of the Pennsylvania Railroad Company to institute any proceedings which they may think proper for securing compensation for the ground formerly belonging to the Pennsylvania Railroad Company occupied by the said part of the railroad north of the tunnel at Market street, and known as section three of the Junction Railroad, as·well as for any money expended or material furnished by the said Pennsylvania Railroad Company in the construction of that part of the said road, and without prejudice to the right of the Junction Railroad Company to assert and maintain, either by way of defence or set-off to any suit or action brought by the Pennsylvania Railroad Company as aforesaid, or in any suit or action brought by the Junction Railroad Company, any claim or demand which the said company may have against the Pennsylvania Railroad Company for or on account of tolls collected by the Pennsylvania Railroad Company on the said Junction Railroad or any part thereof, or for, or on account of their (the said Junction Railroad Company) having been prevented from supplying the motive power required for transporta-

tion on the said Junction Railroad Company and having been compelled to pay excessive and unreasonable rates to the Pennsylvania Railroad Company for supplying said motive power.

2. That the complainants are entitled to complete the construction of the said railroad *via* the location shown by the broken line on the official plan approved by the board of surveyors of the city of Philadelphia on the 21st day of April 1862 (a reduced copy of which plan is annexed to the bill of complaint), from the point where the said railroad is now connected with the railroad of the Pennsylvania Railroad Company east of Thirty-fifth street to Haverford street, and to connect the section of the said railroad lying to the eastward with that lying to the westward of the railroad of the Pennsylvania Railroad Company.

3. That the Pennsylvania Railroad Company, their officers, agents and servants, be restrained from interfering in any manner with the rights of the complainants as thus ascertained and declared, and from obstructing or hindering the complainants, their officers, agents and servants in completing the said railroad as aforesaid, or in using the said railroad as now constructed, or as it may hereafter be constructed as aforesaid, for the passage of engines and cars and the transportation of freight and passengers.

The defendants appealed to the court in banc and in nine specifications assigned the decree for error.

*T. Cuyler*, for appellants.

*J. E. Gowen*, for appellees.

Mr. Justice PAXSON delivered the opinion of the court, January 24th 1876.

It is an undisputed fact in this cause that the portion of railroad track which is the subject of the present contention, was constructed upon ground belonging to the Pennsylvania Railroad Company. The ownership of said track is now claimed by the Junction Railroad Company, it being alleged that the latter company have legally acquired the right of way over said property. If such right of way exists it must have been acquired in one of three ways, viz.: First, by the exercise of the right of eminent domain under powers contained in their charter; second, by express grant from the Pennsylvania Railroad Company; or, third, by such acts of permission or acquiescence on the part of the appellants in its use by the Junction Railroad Company, appellees, from which a grant of the right of way may be presumed, and which, in equity, would estop the appellants from denying the existence of such right.

It is not necessary to discuss the question whether the charter of the Junction Railroad Company authorized said company to

30 P. F. SMITH—19

take a part of the franchises of the Pennsylvania Railroad Company, for the reason that there is nothing in this case to show that there was any such taking in the exercise of the right of eminent domain.   No notice was ever given to the appellants that their property would be so taken.   No payment was ever-made or tendered of the damages, nor was any security ever given or offered therefor, as required by law.   It is not alleged that there was any express grant from the Pennsylvania Railroad Company for this right of way.   If such right exists at all, it must be upon the ground of equitable estoppel.   The error of the argument upon this point consists in treating the late J. Edgar Thomson as the Pennsylvania Railroad Company.   At the period when the Junction Railroad was constructed, Mr. Thomson was the president of both the Pennsylvania and the Junction companies.   His acts or declarations as president of the latter company could no more bind the former company than the acts or declarations of a stranger. As president of the Pennsylvania Railroad Company he was its chief executive officer and general agent in the matter of operating its lines under the powers contained in its charter.   He could not, as such agent, lawfully give away a dollar of the company's property, an inch of its track, or the least of its franchises.   What he could not pass by his direct act, he certainly could not pass by way of estoppel.   To concede that any such power exists in the president of a corporation, by virtue of his office, would be as disastrous in its results as unsound in point of law.   No authority is needed for so self-evident a proposition.   As a director and the president of the Junction Railroad Company, Mr. Thomson was merely the representative of the Pennsylvania Railroad Company to the amount of the stock held by it in the Junction company.

The learned masters find as a fact that the Junction company intended to construct a continuous line of track from Belmont to Gray's Ferry.   From this they argue that the section of the road in dispute, even if constructed by the Pennsylvania company, was, nevertheless, a portion of the continuous line of the former company ; that the Pennsylvania Railroad Company must be held to have constructed it merely as a matter of convenience to themselves, and that the road itself must be deemed and taken as a portion of the Junction road, subject, perhaps, to a liability to make compensation therefor ; that to hold that the Pennsylvania company constructed it at their own expense, for the purpose of claiming the ownership thereof, would be to accuse Mr. Thomson of an act of deception amounting to bad faith.   But it appears clearly in the case that on May 12th 1862, Mr. Thomson, as president of the Pennsylvania Railroad Company, distinctly notified the chief engineer of the Junction road, in writing, that " under the new location of the Junction Railroad, that portion of it between Market and Haverford streets, in the old location, will, in consequence of so

material a portion of the Pennsylvania Railroad being used above Haverford street, be constructed by the Pennsylvania Railroad Company. This is also advisable in consequence of its passing entirely through the grounds of the Pennsylvania Railroad Company." Mr. Thomson also testified that shortly prior to the date of the above letter, in an interview with Mr. Felton, the president of the Philadelphia, Wilmington and Baltimore Railroad, and Mr. Smith, the president of the Reading Railroad, both of whom were directors of the Junction road, he communicated to them the fact that the portion of the Junction road referred to was being constructed by the Pennsylvania Railroad Company.

Mr. Felton and Mr. Smith differ from Mr. Thomson in their recollection of this interview, but Mr. Thomson is strongly corroborated by his letter to Mr. Smith, dated May 13th 1862, and produced from the archives of the Reading Railroad Company. These facts would seem to establish appellants' allegation that, before a blow had been struck or a spade put in the ground, in the construction of the Junction road, Mr. Thomson gave full notice that the section referred to would be made by the Pennsylvania company. This takes the sting out of the allegation of bad faith. This section of the track having been constructed over and upon the ground of the Pennsylvania Railroad Company by that company, and at their own expense, upon notice to the Junction Railroad Company, it would require a much stronger case of equitable estoppel than is here presented to take from the former company its property, lawfully acquired. We do not deem it necessary to extend this opinion by a discussion of the various acts relied upon by the appellees to work an estoppel. The case does not need elaboration. It is too plain.

It is conceded that the portion of track from Haverford street to a point east of Thirty-fifth street was constructed by the Pennsylvania Railroad Company. The Junction Railroad Company do not claim to have made this section. They do claim, however, in this proceeding, the right to construct this portion of the road upon the location adopted by the board of surveyors and approved by the board of directors of the Junction Railroad Company. It appears, however, that this was a mere paper location, no location having been made upon the ground. There was evidence of its abandonment; that the city board of surveyors had surveyed a revised or different line, which revised line has been accepted by the board of directors of the Junction road. Mr. John A. Wilson, the engineer of the latter road, says in his testimony, that this location had been abandoned. In addition, we have the fact that the location referred to is now occupied by six tracks of the Pennsylvania Railroad. It does not present such a case as would justify this court in making any decree in the premises.

It is possible the Junction Railroad Company may have rights

connected with the use of the section of the track referred to; that is to say, from the north side of Market street to Thirty-fifth street, which a court of equity would enforce. Indeed, such was admitted to be the fact upon the argument. But no such question is now before us.

> The decree is reversed and set aside, and the bill dismissed with costs, without prejudice, however, to the right of the plaintiffs to assert, either at law or in equity, any right or rights (if any they have) relating to the use of the railroad tracks, intervening between the point east of Thirty-fifth street, where the Junction Railroad connects with the Pennsylvania Railroad, and the Junction tunnel at Market street.